## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    **Plaintiff,**<br><br>       **v.**<br><br>**CHARLES D. OLIVER,**<br><br>                    **Defendant.** | **No. 6:25-cv-01754**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") alleges:

### <u>SUMMARY</u>

1.     From at least January 2020 through September 2021 (the "Relevant Period"), Defendant Charles D. Oliver ("Oliver"), a Florida-based insurance agent, marketed and sold approximately $52 million of investments in risky, oil and gas securities (the "Oil and Gas Securities") to approximately 50 retail investors. The Oil and Gas Securities were sold in a series of unregistered securities offerings sponsored by Resolute Capital Partners, LLC ("Resolute") and Homebound Resources, LLC ("Homebound"). Resolute paid transaction-based compensation to Oliver through an intermediary company, Beacon Global Group, Inc. ("Beacon Global").

2.      Oliver used a radio show and podcast he hosted, Hidden Wealth Radio, to reach a larger audience and to solicit additional investors. The radio show was broadcast in the Lake Mary, Florida area. During broadcasts, Oliver discussed investment and tax strategy while soliciting clients for his purported investment and tax advisory group Hidden Wealth Solutions. Hidden Wealth Solutions is not a legal entity; it is simply Oliver's "doing business as name" ("DBA").

3.      During the Relevant Period, Oliver acted as an investment adviser through his DBA, Hidden Wealth Solutions. Oliver received, on an annual basis, flat fees and fees as a percentage of assets under management from clients in exchange for providing investment and wealth management advice. He advised clients to invest in the Oil and Gas Securities.

4.      In violation of the federal securities laws, Oliver did not disclose to his advisory clients the additional transaction-based compensation he received for selling the Oil and Gas securities, which breached his fiduciary duty to his advisory clients.

5.      Oliver received at least $4,340,677 in transaction-based compensation from Resolute, through Beacon Global, for sales of Oil and Gas Securities during the Relevant Period.

6.     Oliver has never been registered with the Commission in any capacity.

7.     Many of the individuals to whom Oliver sold the Oil and Gas Securities lost their money. The sponsoring entities, Resolute and Homebound, failed to make interest payments and return principal to debt investors when notes came due and made only *de minimis* distributions to equity investors.

8.     Oliver violated the federal securities laws by, among other things:

(i)     actively participating in the offer and sale of the Oil and Gas Securities in securities offerings that were not registered with the Commission or exempt from registration;

(ii)    acting as a broker in the offer and sale of the Oil and Gas Securities while failing to register with the Commission as, or associate with, a registered broker-dealer; and

(iii)   acting at least negligently, failing to disclose to advisory clients his financial conflict of interest in connection with the sale of the Oil and Gas securities.

9.     Oliver participated in unregistered offerings at key points in the chain of distribution of the Oil and Gas Securities, including by actively soliciting purchases from investors in this District and elsewhere in the United States. The Oil and Gas Securities offerings were not registered with the Commission or exempt from registration.

10.     Oliver acted as an unregistered broker and engaged in the business of effecting transactions in securities for others. Defendant actively solicited his clients to purchase the Oil and Gas Securities and received transaction-based compensation in return.

11.     Acting at least negligently, Oliver also failed to disclose financial conflicts of interest while acting as an investment adviser. He recommended the Oil and Gas Securities to advisory clients, while failing to disclose to those clients the financial compensation he received from the sale of the securities.

## VIOLATIONS AND RELIEF SOUGHT

12.     As a result of conduct alleged in this Complaint, Defendant violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)]; Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)]; and Section 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(2)].

13.     The Commission seeks a judgment from this Court:

(a)    permanently restraining and enjoining Defendant from, directly or indirectly, violating: (a) Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e], Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]; and (b) Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)], by committing or engaging in specified actions or activities relevant to such violations;

(b)     permanently restraining and enjoining Defendant from, directly or indirectly, including but not limited to through any entity he owns or controls, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities for his own personal account;

(c)     restraining and enjoining Defendant from, directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser; for purposes of this paragraph: (a) a person is associated with a broker or dealer if such person is a partner, officer, director, or branch manager of such broker or dealer (or occupies a similar status or performs similar functions), directly or indirectly controls, is controlled by, or is under common control with such broker or dealer, or is an employee of such broker or dealer; and (b) a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser;

(d)     ordering Defendant to disgorge his ill-gotten gains, together with prejudgment interest thereon pursuant to Sections 21(d)(3), (d)(5), (d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)]; and

(e)     ordering Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## **JURISDICTION AND VENUE**

14.     The Commission brings this action pursuant to the authority

conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §§ 77t(b)],

Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

15.     This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], and Sections 209(d), 209(e), and 214(a) of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), and 80b-14(a)].

16.     In connection with the conduct alleged in this Complaint, Defendant, directly or indirectly, has made use of the means or instruments of transportation or communication in interstate commerce, or of a means or instrumentality of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint. Among other things, Defendant engaged in interstate emails and telephone calls with clients and Resolute personnel.

17.     Venue lies in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Section 27 of the Exchange Act [15 U.S.C. §78aa(a)], and Section 214 of the Advisers Act [15 U.S.C. §80b-14] because Defendant transacted business here, certain of the allegations in this Complaint occurred here, and Defendant resides and maintains a principal place of business in Lake Mary, Florida.

## TOLLING AGREEMENTS

18.     Defendant and the Commission executed tolling agreements that tolled the running of any applicable statute of limitation from October 8, 2024 to July 5, 2025. The Defendant's securities law violations during the Relevant Period are within the five-year statute of limitations for certain relief as set forth in 28 U.S.C. § 2462.

## DEFENDANT

19.     **Charles Davis Oliver, age 54**, resides in Lake Mary, Florida. Oliver is a licensed insurance agent in Florida. During the Relevant Period, Oliver did business under the name Hidden Wealth Solutions and was the owner and operator of Hidden Wealth Radio, a radio show and podcast that focused on alternative investments and tax strategy. Oliver has never been registered with the Commission as a securities broker or associated with a registered broker.

## OTHER RELEVANT PERSONS AND ENTITIES

20.     **Beacon Global Group, Inc.** is a Georgia company located in Marietta, Georgia. Beacon Global purports to offer consultancy services to businesses.

21.     **Resolute Capital Partners LTD, LLC** is a Nevada company with offices in Texas, California, and Minnesota. Resolute created numerous

oil and gas debt and equity investment vehicles using oil and gas wells identified by Homebound and its affiliates.

22.    **Homebound Resources, LLC ("Homebound")** is a Texas company located in Irving, Texas. Homebound acted as a project sponsor for Resolute's offerings and was responsible for identifying and purchasing the oil and gas wells in which the Resolute investment vehicles owned working interests.

23.    **Thomas Joseph Powell ("Powell")**, age 53, is a resident of Reno, Nevada. Powell was the owner of Resolute and other related entities and served as the Senior Managing Partner of Resolute during the Relevant Period.

24.    **Stefan Tiberiu Toth ("Toth")**, age 48, is a resident of Frisco, Texas. Toth is the founder, co-owner, Chairman and Chief Executive Officer of Homebound Financial Group, LP, and also operated and controlled its subsidiaries, including Homebound, during the Relevant Period.

25.    A 2021 Commission Order found that Resolute, Homebound, Powell, and Toth violated registration and anti-fraud provisions of the federal securities laws. *See In the Matter of Resolute Capital Partners, Ltd, LLC, et al.*, AP File No. 3-20597 (Sept. 24, 2021) (the "Commission Order"). In particular, the Commission Order found that Homebound, Resolute,

Powell, and Toth sold the Oil and Gas Securities in unregistered offerings that were not exempt from registration. It also found that their offering disclosures were inadequate and that they made materially misleading statements in marketing the Oil and Gas Securities. The misleading statements included insufficiently supported oil production projections, assertions about potential tax benefits that were unavailable to certain investors, and incomplete disclosures about potential uses of investor funds, including the amount of funds that would be used for payments to prior debt and equity investors.

26.     Each of Homebound, Resolute, Powell, and Toth reached a settlement with the Commission, neither admitting nor denying the Commission's findings. The Commission Order found that Homebound, Resolute, Powell, and Toth violated Sections 5(a) and (c) and 17(a)(2) and (3) of the Securities Act and that Powell and Toth additionally violated Section 15(a) of the Exchange Act. *See* https://www.sec.gov/files/litigation/admin/ 2025/34-102390.pdf.

<u>**FACTS**</u>

**I.**     <u>**The Unregistered Offerings of the Oil and Gas Securities**</u>

27.     The Oil and Gas Securities offered and sold by Resolute and Homebound included both equity securities and debt securities. The securities were offered and sold throughout the Relevant Period.

28.     The equity securities were membership interests in pooled investment vehicles that purchased a percentage interest in a set of oil and gas wells identified and purchased by Homebound, including, for example, offerings titled Advantage Capital Holdings – I, LLC ("Advantage I"), Advantage Energy II, Advantage Capital IV, and Strategic Energy Assets – VIII. The offering materials for these equity securities stated that investors could expect monetary distributions from revenue earned by the wells' oil or gas production and revenue from any subsequent sale of the wells.

29.     The debt securities were promissory notes issued by subsidiaries of Homebound, including, for example, offerings titled Choice Energy Holdings – III, the Resolute "Technology" Fund, and Technology Entry II." The offering materials for these debt securities stated that the proceeds would be used by a subsidiary of Homebound to acquire oil and gas leases, among other things. The offering materials promised fixed interest payments ranging between 8% to 12% and the return of capital upon expiration of the notes.

30.     The Oil and Gas Securities were "securities" within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. The equity securities involved investors paying money to purchase membership interests in a common enterprise, and a reasonable expectation

of profits based on the efforts of third parties who identified, acquired, and drilled the wells. The promissory notes were "notes" as included in the definition of "security" set forth in Section 2(a)(1) of the Securities Act.

31.    The offerings of Oil and Gas Securities were required to be registered with the Commission under Sections 5(a) and (c) of the Securities Act or otherwise qualify for an exemption from registration. During the Relevant Period, no registration statement was filed or in effect for any offering of the Oil and Gas Securities, and no exemption from registration applied to these securities offerings.

## II.    Oliver Contracted with Beacon Global to be a "Referral Agent" for Resolute

32.    On October 12, 2018, Beacon Global entered into a "Master Services Agreement" with Resolute. The agreement obligated Beacon Global to provide "support and compliance services" to Resolute. This included Beacon Global contracting with "Referral Agents" who would "refer" investors to Resolute for potential investment in the Oil and Gas Securities. Beacon Global was also required to provide "payment services" to Resolute by receiving a monthly ACH transfer from Resolute and using the funds to compensate the "Referral Agents." The agreement stated that Beacon Global was to receive compensation, on a monthly basis, of the greater of (a) $20,000

or (b) 0.4% of monies brought in by the "Referral Agents." The agreement also provided for reimbursement of Beacon Global's expenses.

33.    On October 23, 2018, Oliver entered into an agreement with Beacon Global to act as a "Referral Agent" (or "Referral Contractor," as the agreement states) for Resolute. The "Referral Contractor Agreement" provided that Beacon Global would compensate Oliver for "referring" investors to Resolute for investment in the Oil and Gas Securities. It specified that Oliver would be paid both a monthly fee and additional transaction-based compensation for his efforts. On July 22, 2020, Oliver entered into a new "Referral Contractor Agreement," which updated the terms of Oliver's compensation, but similarly provided that Beacon Global would compensate Oliver for his "referral" of investors to Resolute.

34.    The agreements prohibited Oliver, as a "Referral Contractor," from engaging in certain activities. Among other things, Oliver was not permitted to:

      a.  "Provide to prospective investors or lenders ('Prospects') any offering documents related to investment opportunities";

      b.  "Sell any securities or engage in any sales efforts";

      c.  "'Pre-sell' securities offered by [Resolute] in order to gauge a Prospect's interest in an investment";

      d.  "Solicit any Prospect for investment";

12

e. "Make any recommendation with respect to a potential investment";

f. "Give any advice or express any opinion with respect to a potential investment, or its advantages or disadvantages";

g. "Conduct any suitability analysis, conduct any due diligence, provide any valuation services, or provide any analysis of a potential investment";

h. "Do any advertising or mass marketing";

i. "Modify existing or create new educational materials"; and

j. "Compensate another person, entity, or other third party based on a referral's investment into any product."

Despite the foregoing prohibitions in the agreements, as described below, Oliver engaged in sales activities.

## III.   Oliver's Sales Activity Relating to the Oil and Gas Securities

35.    Although the "Referral Contractor Agreements" purported to limit his services to finding and referring potential investors to Resolute, Oliver in fact participated in the offer and sale of the Oil and Gas Securities to investors.

36.    Oliver sought out prospective investors through general solicitation efforts. He frequently touted his investment advisory services through his Hidden Wealth Radio program. Oliver discussed generally tax-

minimizing investment strategies, and told his listeners that if they were interested, they should contact him directly for additional information.

37.    When listeners reached out to Oliver, they were invited to meet with him and his staff at the Hidden Wealth Group offices in Lake Mary, Florida, or alternatively, to meet via video conference. There, prospective clients were given questionnaires to assess their assets, expenses, wealth, risk tolerance, and retirement goals. Prospective clients later agreed to be advisory clients of Hidden Wealth Group and paid either percentage fees based on assets under management, or flat annual advisory fees.

38.    Oliver also hosted investment presentations in various locations including Orlando, Florida. Some potential investors attended these presentations via Zoom Video Meeting. At the presentations, Oliver spoke generally about oil and gas investing and introduced the main presenters—Stephan Toth of Homebound and Thomas Powell of Resolute.

39.    Oliver described the Oil and Gas Securities in detail to his clients. He provided clients with marketing and offering documents for the securities, which he then reviewed with them, and discussed with clients the tax benefits of investing in the Oil and Gas Securities. Oliver advised his clients that the government provides tax incentives for investing in the securities, and that Resolute and Homebound had special technology which

14

allowed them to purchase old wells and make them productive. Oliver also advised clients that they should expect to double their money within approximately three years, when the rejuvenated wells would be sold for a substantial profit.

40.     Oliver provided clients with proposed portfolio allocations, suggesting how clients should invest in the various Oil and Gas Securities. He referred to these proposed portfolio allocations as "Custom Blueprint Plans."

41.     Oliver told clients that Thomas Powell was the largest investor in the Oil and Gas Securities, repeating a false statement made by Powell at investment seminars.

42.     Oliver told clients that he was a large investor in the Oil and Gas Securities, and that he was on the Resolute board of directors.

43.     Oliver told clients that his son was an intern with Resolute.

44.     Oliver advised and answered questions from clients about their suitability for investing in the Oil and Gas Securities.

45.     Oliver prepared and sent clients detailed emails extolling the benefits of investing in the Oil and Gas Securities. For example, one multi-page email to a client sent in April 2020 stated in part:

> The Resolute Capital business model is to build up and then sell their projects for a profit. The average payout period for each sold

15

project has been under 34 months. The performance has been a two times multiple average (Ex. 100k = 200k). The next project just became available Oct. 1st, and will be raising 100 million total capital raise.

46.    Oliver closely tracked his clients' investments in the Oil and Gas Securities with Resolute. Oliver maintained records tracking, among other things, which clients had completed investment paperwork, whether they had signed relevant investment documents, and how much they had invested. Oliver also reached out to clients to confirm when they invested. As described above, Oliver actively participated in the sale of the Oil and Gas Securities to clients and was not merely a referral agent.

47.    Oliver also was an investment adviser through his DBA Hidden Wealth Solutions and advised clients to invest in the Oil and Gas Securities. Oliver received percentage fees of assets under management and flat annual fees in exchange for providing these clients investment and wealth management advice. Oliver failed to disclose to these clients who purchased the Oil and Gas Securities the financial compensation Oliver received from Resolute/Beacon, which was a breach of his fiduciary duty to his advisory clients. Following his recommendation, certain of Oliver's clients purchased the Oil and Gas Securities.

48.    As part of his suite of services, Oliver also offered certain tax services including the preparation and filing of tax returns.

49. At times, Oliver negotiated debt security interest rates with Resolute on behalf of investors.

50. Oliver's contribution to the distribution of the Oil and Gas Securities was not *de minimis*. To the contrary, he generated approximately $52 million of sales for Resolute during the Relevant Period.

## IV. Specific Examples of Oliver's Fraud and Deceit upon Investors

### A. Investor A

51. Investor A is a retired senior citizen who resides in Arizona.

52. In or around late 2019 and early 2020, Investor A heard advertisements for Oliver's advisory services on his radio program Hidden Wealth Radio, which was broadcast on Saturday mornings. On the broadcasts, Investor A heard Oliver discuss tax avoidance and retirement investing. Investor A subsequently performed online research, and reviewed the Hidden Wealth Solutions website, including watching some of the videos on Oliver's website. Investor A believed that Oliver's investment strategies seemed appealing, so he called Oliver.

53. During the initial call, Oliver and his team took information regarding Investor A's current investments and requested a statement of current assets, which was provided. Oliver later provided Investor A with a "blueprint plan" to give specific advice on how to invest for retirement.

Investor A agreed with Oliver's investment plan and transferred money from his brokerage account and his bank account for Oliver to manage.

54.     Investor A regarded Oliver as his investment adviser. Oliver charged Investor A $1,500 per year for managing his investments and providing tax services. Oliver also earned 1.5% from managing the assets in Investor A's brokerage account.

55.     Oliver recommended that Investor A purchase the Oil and Gas Securities offered through Resolute. Oliver showed Investor A some charts and projections regarding the Oil and Gas Securities. Oliver explained that the investment would double every 12-18 months. Oliver's main pitch to Investor A was that the Oil and Gas Securities provided a tax benefit. Oliver also told Investor A that he was an investor in the Oil and Gas Securities, and that he was on the Resolute board of directors.

56.     Based on Oliver's advice, Investor A invested in the Oil and Gas Securities that he suggested. All of Investor A's Oil and Gas Securities were in Advantage Capital Holdings – 1, LLC ("Advantage I"), an equity investment: investments of $210,000 on February 14, 2020; $50,000 on February 18, 2020; $100,000 on February 21, 2020; and $50,000 on February 24, 2020.

57.    In total, Investor A invested $410,000 in the Oil and Gas Securities based on Oliver's advice and recommendations.

58.    Oliver never disclosed to Investor A whether he received compensation from selling and/or referring these Oil and Gas Securities.

59.    Investor A never received any of his money back that he invested in the Oil and Gas Securities.

**B.    Investor B**

60.    Investor B is a retired senior citizen who resides in Connecticut.

61.    In or around late 2019 and early 2020, Investor B listened to Oliver's radio program Hidden Wealth Radio, which were broadcast on Saturday mornings. Investor B heard Oliver discuss tax avoidance and retirement investing on the radio programs. Investor B heard Oliver discuss a variety of investment strategies, with a focus on tax benefits via alternative investments.

62.    In or around late 2019 and early 2020, after listening to Oliver's show three to four times, Investor B contacted Oliver regarding his advisory services. During the initial call, Oliver collected information about Investor B's assets, income, and expenses. Oliver sent her questionnaires to fill out regarding her risk tolerance and retirement goals. Oliver also had her complete a suitability questionnaire.

63.     In early 2020, Investor B retained Oliver as her investment advisor. Oliver led Investor B to believe that he was an investment advisor, and according to Investor B, convinced her to trust him. Although not certain on the specifics, Investor B believes that Oliver received a management fee for managing her assets.

64.     Oliver typically communicated with Investor B via telephone.

65.     Oliver sent to Investor B marketing materials that he purportedly received from Resolute regarding the Oil and Gas Securities. Oliver also send Investor B links to Zoom meetings with representatives of Resolute. According to Investor B, Oliver spoke during these presentations, speaking generally about the benefits of investing in oil and gas while introducing the Resolute presenters.

66.     In or around January 2020, Oliver explained the general concept of the Oil and Gas Securities to Investor B and recommended that she invest. Oliver also told her that the government wants people to invest in oil and gas so they give tax incentives. Oliver explained to Investor B that the investments were a good tax savings vehicle, and that Resolute was buying old wells and using new technology so they could extract from these wells.

67.     Oliver told Investor B that his son was an intern for Resolute.

68.     Based on Oliver's advice, on January 2, 2020, Investor B invested $200,000 in Strategic Energy Assets - VIII (an equity investment). Subsequently, Investor B invested an additional $150,000 in Choice Energy Holdings - III on March 9, 2020 (a debt investment). Oliver told Investor B that it may take two to three years before she starts receiving money back.

69.     In total, Investor B invested $350,000 in the Oil and Gas Securities based on Oliver's advice and recommendations.

70.     Oliver never disclosed to Investor B whether he received compensation from selling or referring these Oil and Gas Securities.

71.     Investor B never received any of her money back that she invested in the Oil and Gas Securities.

**C.      Investor C**

72.     Investor C is a retired senior citizen who resides in Indiana.

73.     In or around March 2020, Charles Oliver was referred to Investor C. Oliver called Investor C to discuss his services. Oliver had Investor C complete a suitability questionnaire. Investor C told Oliver that she was very conservative with her investing, and Oliver explained that the Oil and Gas Securities were not risky.

74.     In or around March 2020, Investor C retained Oliver as her investment advisor, where he waived the flat advisory fee because her cousin

was one of his clients. However, Investor C paid Oliver a percentage advisory fee for managing her money held in a brokerage account.

75.    Oliver provided Investor C with a plan for how to invest her money in the Oil and Gas Securities. Oliver told her that if she invested in oil and gas, it would offset taxes from her previous investments. Oliver also told her that he and his family were all invested with the Oil and Gas Securities, so Investor C assumed the investments were safe.

76.    Oliver arranged a personal Skype video meeting with Investor C, Oliver, Thomas Powell of Resolute, and Stefan Toth of Homebound. Oliver moderated the discussion and spoke generally about the Oil and Gas Securities, Resolute, and Homebound. Both Toth and Powell made presentations regarding their investment offerings during the video meeting.

77.    Based on Oliver's continued advice, Investor C made several investments in the Oil and Gas Securities, including a $100,000 investment in Choice Energy Holdings III in April 2020; $50,000, $50,000, and $62,000 in separate investments in Advantage Capital IV in August 2020; $90,000 in Strategic Energy Assets VIII in September 2020; $10,000 in Advantage Energy II in September 2020; $10,000 in Choice Energy II in September 2020; and $5,000 in Tech Entry II in September 2020.

78.     In total, Investor C invested approximately $337,000 in the Oil and Gas Securities based on Oliver's advice and recommendations. Investor C received dividend payments for a while until Resolute stopped making the payments. Investor C lost $216,000 in the Oil and Gas Securities. Investor C has been unable to contact Oliver since the Resolute scheme collapsed.

79.     Oliver never disclosed to Investor C whether he received compensation from selling or referring the Oil and Gas Securities.

### D.    **Investor D**

80.     Investor D is a retired senior citizen who resides in Florida.

81.     Investor D listened to Oliver's radio program Hidden Wealth Radio nearly every week for years, which was broadcast on Saturdays. On the broadcasts, Oliver discussed tax avoidance and retirement strategies. In or around January 2019, Investor D contacted Oliver to discuss his services.

82.     On or around January 24, 2019, Investor D and his spouse met with Oliver at his Lake Mary, Florida office. According to Investor D, Oliver and his team assessed Investor D's assets and retirement goals. Investor D paid Oliver a $2,500 annual fee for his advisory services. In subsequent years, he waived the fee because Investor D complained about a lack of returns and not receiving timely, relevant financial statements relating to his Oil and Gas Securities.

83.     On or around January 24, 2019, at Oliver's office, Oliver and his assistant made a presentation to Investor D regarding investing in oil and gas. Oliver explained that Resolute buys unproductive wells from large oil companies, uses special technology to extract oil from the wells, and makes a "fortune" extracting and selling the oil and later selling the wells. Oliver explained that the Oil and Gas Securities allowed for a 100% tax deduction from any qualified money that Investor D invested. Oliver explained that these were equity investments that were not regulated by the SEC. Oliver said that over the course of several years, none of the Resolute investments had returned less than 80% in 18-32 months.

84.     After the presentation, Investor D informed Oliver that he was interested in making the investment. Oliver had him complete a suitability questionnaire. Upon reviewing his questionnaire, Oliver told Investor D that his selections were too conservative and advised him on how to answer the questionnaire so that he would be eligible to invest in the Oil and Gas Securities.

85.     Based on Oliver's advice, Investor D transferred most of his traditional 401k retirement account funds to an IRA with Goldstar Trust Company.

86.    Based on Oliver's continued advice, Investor D made several investments in the Oil and Gas Securities, including a $50,000 investment in Choice Energy Holdings, III, LLC on March 17, 2020.

87.    In total, Investor D invested $550,000 in the Oil and Gas Securities based on Oliver's advice and recommendations. Investor D only received approximately $10,000 back from the investments before the Resolute scheme collapsed.

88.    Oliver never disclosed to Investor D whether he received compensation from selling or referring the Oil and Gas Securities.

89.    After the Resolute payments and statements stopped, during a telephone call, Investor D asked Oliver and his assistant if this was a Ponzi scheme. After a long pause, Oliver eventually responded that everything with Resolute was legitimate. Oliver repeatedly made excuses to Investor D for why payments were delayed, and Oliver repeatedly said he and his mother were also investors.

### E.    Investor E

90.    Investor E is a retired senior citizen who resides in Florida.

91.    In or around January 2019, Investor E began listening to Oliver's radio program Hidden Wealth Radio, which was broadcast on Saturday mornings. On the broadcasts, Oliver discussed tax avoidance and retirement

strategies through oil and gas investing. In or around January 2019, Investor E contacted Oliver to discuss his services.

92.     In or around January 2019, Investor E and her husband, who is now deceased, visited Oliver at his offices in Lake Mary, Florida. According to Investor E, Oliver assessed their risk tolerance, assets, and financial goals. They paid Oliver a flat annual fee of approximately $1,500 for his advisory services.

93.     Through at least February 2021, Oliver took over management of all of Investor E's and her husband's investments and told them what to buy and sell. Oliver showed them on his computer how much money they would make in the Oil and Gas Securities.

94.     Oliver aggressively pushed Investor E and her husband to purchase the Oil and Gas Securities and told them how wonderful the securities were for them. Oliver told Investor E and her husband that the Oil and Gas Securities would provide greater returns than their current investments.

95.     Based on Oliver's continued advice, Investor E made several investments in the Oil and Gas Securities, including a $170,000 investment in Choice Energy Holdings III in February 2020, and again in February

2021; a $50,000 investment in Advantage I in April 2020; and a $50,000 investment in Advantage I in May 2020.

96.    In total, Investor E and her late husband invested approximately $662,000 in the Oil and Gas Securities based on Oliver's advice and recommendations. They received dividend payments for a while until Resolute stopped making the payments. Investor E and her husband lost most of their money in the Oil and Gas Securities.

97.    Oliver never disclosed to them whether he received compensation from selling or referring the Oil and Gas Securities.

98.    Investor E believes Oliver lied to her and her husband when Resolute stopped paying dividends so that she would continue with her investments and not withdraw funds.

**F.    Investor F**

99.    Investor F is a retired senior citizen who resides in Florida.

100.    In or around February 2020, Investor F began listening to Oliver's radio program Hidden Wealth Radio, which was broadcast on Saturday mornings. On the broadcasts, Oliver discussed tax avoidance and retirement strategies through oil and gas investing. In or around February 2020, Investor F contacted Oliver to set up an appointment.

101.   In or around February 2020, Investor F and her husband met with Oliver at his office in Lake Mary, Florida. According to Investor F, Oliver assessed their assets, risk tolerance, and goals. Investor F and her husband paid Oliver a flat fee of $1,000 to be their investment adviser. Oliver also received as a fee a percentage of their assets that he was managing. Investor F and her husband told Oliver that they did not want to gamble with high-risk investments due to their age and retirement status.

102.   In or around March 2020, Oliver recommended that they invest in the Oil and Gas Securities. Oliver told them that he had invested a lot of money in the Resolute investments, that his son was doing an internship with Resolute, and that he would not recommend anything in which he would not personally invest. Oliver also provided them with Resolute marketing materials further encouraging them to invest.

103.   Based on Oliver's continued advice, Investor F and her husband invested $142,000 in Strategic Energy Assets VIII in or around March 2020. They received a few small distributions from the investment and lost nearly all of their money.

104.   Oliver never disclosed to Investor F whether he received compensation from selling or referring these Oil and Gas Securities.

## CLAIMS FOR RELIEF

## Count I

## (Violations of Sections 5(a) and 5(c) of the Securities Act)

105.   The Commission re-alleges and incorporates by reference the allegations in paragraphs 1-104, inclusive, as if they were fully set forth herein.

106.   As detailed above, Oliver, by engaging in the securities offerings alleged in this Complaint directly or indirectly:

    (a)    made use of the means or instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise, without a registration statement in effect as to such securities;

    (b)    carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale, without a registration statement in effect as to such securities; and

    (c)    made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

107.   There were no applicable exemptions from registration for the offerings Oliver engaged in as described herein.

108.   By reason of the foregoing, Defendant violated, and, unless enjoined, is reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a) and 77e(c).

## Count II

### (Violations of Section 15(a) of the Exchange Act)

109.   The Commission re-alleges and incorporates by reference the allegations in paragraphs 1-26, and 32-104, inclusive, as if they were fully set forth herein.

110.   As detailed above, Defendant, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as a broker or dealer, effected transactions in the purchase or sale of securities, while Oliver was not registered with the Commission as a broker or dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

111.   By engaging in the conduct described above, Defendant violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## Count III

### (Violations of Section 206(2) of the Advisers Act)

112.   The Commission re-alleges and incorporates by reference the allegations in paragraphs 1-26, and 35-104 inclusive, as if they were fully set forth herein.

113.   By engaging in the acts and conduct alleged in this Complaint, Defendant acted as an investment adviser to his clients within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because, for compensation, he engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

114.   As detailed above, Defendant, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce, while acting as an investment adviser, acting with at least negligence, engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client.

115.   As an investment adviser, Defendant owed his clients a fiduciary duty of utmost good faith, undivided loyalty, and care to make full disclosure to them of all material facts, as well as a duty to act in their best interests and not to act in his own interests to the detriment of his clients.

116.   Defendant breached his fiduciary duty to clients and engaged in fraudulent conduct by not disclosing conflicts of interest to his clients.

117.   By reason of the foregoing, Defendant violated, and unless enjoined is reasonably likely to continue to violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court find that Defendant committed the violations of the federal securities laws alleged herein and:

## I.

## Permanent Injunction

Issue an Order permanently restraining and enjoining Defendant from, directly or indirectly, violating (a) Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)], Section 15(a) of the Exchange Act [15 U.S.C. § 78(o)]; and (b) Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)], by committing or engaging in specified actions or activities relevant to such violations.

## II.

## Conduct Based Injunction – Purchase, Offer, Sale of Security

Issue an Order permanently restraining and enjoining Defendant from,

directly or indirectly, including but not limited to through any entity he owns or controls:  participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Oliver from purchasing or selling securities for his own personal account.

## III.

### <u>Conduct Based Injunction – Broker, Dealer, Investment Adviser Bar</u>

Issue an Order restraining and enjoining Defendant from, directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser; for purposes of this paragraph: (a) a person is associated with a broker or dealer if such person is a partner, officer, director, or branch manager of such broker or dealer (or occupies a similar status or performs similar functions), directly or indirectly controls, is controlled by, or is under common control with such broker or dealer, or is an employee of such broker or dealer; and (b) a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser.

## IV.

## Disgorgement with Prejudgment Interest

Issue an Order directing Defendant to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon, pursuant to Section 21(d)(3), (d)(5), (d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)];

## V.

## Civil Penalty

Issue an Order directing Defendant to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

## VI.

## Further Relief

Granting such other and further relief as this Court may deem just, equitable, or necessary.

## VII.

## Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action and the Defendant in order to implement and

carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## **DEMAND FOR JURY TRIAL**

The Commission hereby demands a trial by jury in this case.

Date: August 11, 2025

Respectfully submitted,

*/s/ Brian T. Fitzsimons*

Brian T. Fitzsimons
Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549
Tele: (202) 551-5905 (Fitzsimons)
fitzsimonsb@sec.gov

Of Counsel
Brian O. Quinn
David T. Frisof